# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

HILDA SOLIS, Secretary of Labor,    )
                                          )
        Plaintiff,                   )          NO. 3:10-00472
                                            )          JUDGE HAYNES
v.                                        )
                                          )
TENNESSEE COMMERCE        )
BANCORP, INC., et al.,           )
                                          )
        Defendants.             )

## M E M O R A N D U M

Plaintiff, Hilda Solis, the Secretary of Labor, filed this action under Section 806 of the

Sarbanes-Oxley Act of 2002 ("SOX"), 18 U.S.C. § 1514A, the Wendell H. Fort Aviation

Investment and Reform Act for the 21st Century ("AIR 21"), 49 U.S.C. § 42121(b)(2)(a) and

(b)(3) and the Rules implementing Section 806 of SOX, 29 C.F.R. Part 1980 against the

Defendants, Tennessee Commerce Bancorp, Inc. and Tennessee Commerce Bank.  The Secretary

cites the Defendants' refusal to obey her preliminary order to reinstate George Fort, the

Defendant's former chief financial officer, whom the Secretary found reasonable cause to believe

was unlawfully discharged by Defendants in violation of Section 806(a) of the SOX and entitled

to preliminary injunctive relief.

Before the Court is the Secretary's motion for a temporary restraining order and

preliminary injunction (Docket Entry No. 2) and Defendants' motion to dismiss (Docket Entry

No. 5).  In her motion, the Secretary asserts that after investigation and consultations with the

Defendants, she found that Fort's "protected activity was a contributing factor in the adverse

-1-

actions taken against him" and that such conduct warrants the Secretary's Order awarding Fort preliminary injunctive relief, including reinstatement, back-pay, restoration of benefits and attorney fees.

In response to the Secretary's motion, Defendants filed a motion to dismiss, contending, in sum, that the Court lacks jurisdiction to enforce the Secretary's preliminary orders, citing, inter alia, Bechtel v. Competitive Technologies, Inc., 448 F.3d 469 (2d Cir. 2006). In addition, Defendants argue that the Secretary's order violates the Defendants' due process rights because the preliminary order results in a permanent and irreparable loss to the Defendants of the permanent deprivation of payments and wages pending a final resolution of the Secretary's proceedings against the Defendants.

The Court set an argument[1] on the Secretary's motion and also entertained argument on the Defendants' motion with its jurisdictional and due process challenges as well as a response to the Secretary's motion. By agreement of the parties, given the critical jurisdictional and public interest issue, the Court issues this ruling without further hearing and briefing.

## A. FINDINGS OF FACT

Based upon the attachments to her complaint, the Secretary issued detailed "Secretary's Findings" that support her preliminary order. In relevant part, these "Secretary's findings" were as follows.

On April 4, 2008, Complainant filed a complaint with the Secretary of Labor and

---

[1]At the argument, counsel for the Defendants' board of directors appeared and stated the directors' intention to intervene in this action given their potential individual liability. This action seeks only enforcement of an administrative order. The directors could not be held liable for obeying any order of this Court. Their liability, if any, arises from acts at issue in the administrative proceeding.

amended the complaint on May 9, 2008, alleging Tennessee Commerce Bancorp discriminated against him in violation of SOX. As this complaint was filed within 90 days of the alleged adverse actions, it is deemed timely.

Complainant was hired by Tennessee Commerce Bank on February 1, 2004 as the Vice President of Finance and promoted to Chief Financial Officer (CFO) on September 1, 2005. Complainant entered into an employment contract with Tennessee Commerce Bank as the CFO on January 19, 2006 with an annual pay rate of $110,000.00. Complainant was also a member of the SOX Steering Committee and Tennessee Commerce Bank's SOX and Securities and Exchange Commission (SEC) Compliance officer.

Three months after Complainant was promoted to CFO, Tennessee Commerce Bancorp became publicly traded on the NASDAQ. As Tennessee Commerce Bank's SOX and SEC compliance officer, Complaint was responsible for identifying policies and procedures that would bring Tennessee Commerce Bank into compliance with SEC guidelines. SEC compliance was required starting in 2007.

On January 20, 2006, Chief Executive Officer Arthur Helf wrote a letter to Complainant to acknowledge the fine job Complainant was doing by handling a myriad of details and procedures necessary to bring everything in line for the SEC, Tennessee Department of Financial Institutions (TDFI) and Federal Deposit Insurance Corporation (FDIC), as well as facilitating Tennessee Commerce Bank's year end closing. Mr. Helf noted that Complainant handled the challenges well.

On August 6, 2006, Mr. Helf issued a memo to Complainant, in recognition for Complainant's performance as CFO, with a compensation increase to an annual salary of $150,000 and year-end bonus of $150,000. On June 1, 2007, Complainant, President Mike Sapp, Chief Administrative Officer (CAO) Lamar Cox and Mr. Helf received significant pay increases of over 100% each. Complainant's pay increased to $335,000.00 per year. Because of the large pay increases to Complainant, Mr. Helf, Mr. Sapp and Mr. Cox on June 1, 2007, three board members resigned. In January of 2008, Complainant, Mr. Sapp, Mr. Cox and Mr. Helf received bonuses equal to their annual salary.

Mr. Helf sent an email to Complainant with a copy to Mr. Sapp on June 11, 2007, in which Mr. Helf said "*I would like to exercise my options this week. I will be out Thursday and Friday ...Let me know how much cash I will need for taxes. I would (like) to sell these prior to any blackout.*" Total options were 165,872 shares for a total of $1,134.360.00. Mr. Helf said "*Let me know if you envision any problems bringing this off*" This transaction was questionable to

-3-

Complainant because he knew Mr. Helf had insider knowledge that the large pay increases would soon be publicized in an 8k and that the three board members were going to resign because of the large pay increases. Complainant cautioned Mr. Helf about the timing of the transaction and that it could cause Tennessee Commerce Bank's stock to drop. Mr. Helf told Complainant the sale had been approved by Tennessee Commerce Bank's law firm so Complainant did not pursue the issue at that time.

**Complainant engaged in numerous protected activities, as follows:**

Complainant requested via emails to Mr. Sapp and Mr. Helf that position descriptions be put in place on May 26, 2006, November 6, 2006, November 16, 2006, December 5, 2006, January 31, 2007, May 22, 2007, July 10, 2007, November 28, 2007 and January 31, 2008. In the January 31, 2007 email, Complainant specifically noted that position descriptions would help address many of the *"internal control issues"* that were making it hard for him to have confidence in the financials. Complainant also stated in the email that the *"job description would address internal control* issues *that are inherent in the reporting structure at Tennessee Commerce Bank."* Complainant further addressed a concern about some of Mr. Cox's areas of responsibility that should be under Complainant as the CFO.

On or about August 31, 2007, the Deposit Operations Manager, who reported to Mr. Cox, confronted Complainant and one of Complainant's employees. In the days after the incidents, Complainant accused Mr. Helf and Mr. Sapp of not sufficiently addressing the situation. Complainant sent a memo to Mr. Helf describing the confrontation and expressing concerns about work place safety. Mr. Helf made memos to the file about Complainant's subsequent behavior on September 12, September 13 and September 17, 2007. Mr. Helf also made a memo to the file about his investigation of the "dust up" but did not terminate the Deposit Operations Manager.

On September 3, 2007, Complainant sent an email to Mr. Helf, Mr. Sapp and Mr. Cox about new policies and revisions. Complainant noted that they had locked down the policies and procedures and suggested it would prevent a SOX noncompliance if the procedures for changing policy are followed.

Complainant sent an email to Mr. Helf and Mr. Sapp on September 30, 2007 about file maintenance procedures not being followed. Complainant noted after meeting with internal and external auditors that it appears Tennessee Commerce Bank would not be able to pass SOX compliance. Complainant complained this area was "completely out of my control" and asked for Mr. Helf and Mr. Sapp to make the issue a priority.

-4-

Complainant sent an email to the *"TEAM"* on October 16, 2007 regarding *"Insider Trading".* Complainant said there had been several questions that came up recently about stock trading and provided a copy of Tennessee Commerce Bank's *"Insider Trading Policy"* which should answer most of their questions. Complainant advised if they had any questions to contact him.

Mr. Helf made a memo to the file on November 6, 2007 about a stock purchase that he made on August 9, 2007. Mr. Helf noted in that memo that he and Mr. Sapp met with attorneys Marlee Mitchell, Sheila Sawyer and Waverly Crenshaw of the Waller Lansden law firm at their office to discuss their dissatisfaction with Complainant's behavior. Mr. Helf noted that he had concerns regarding Complainant's SEC expertise. Mr. Helf also recorded that Ms. Mitchell discussed Complainant's allegation that Mr. Helf caused SEC violations by making trades when Complainant was out of the office. At the end of the memo, Mr. Helf stated *"George has a serious problem."*

As part of Crowell and Crowell's (Tennessee Commerce Bank's internal auditors) audit, they identified suspicious activity in employee accounts on or about November 30, 2007. The suspicious activity was shared with Complainant but he did not receive a copy of the report until January 17, 2008. Complainant shared Crowell and Crowell's verbal findings with Mr. Helf and Mr. Sapp on or about December 19, 2007. Complainant raised concerns again with Mr. Helf and Mr. Sapp on January 18, 2008 and January 24, 2008.

Complainant informed Mr. Sapp and Mr. Helf on January 24, 2008 that he could not sign the upcoming 10k on March 17, 2008 because of his concerns about internal controls, employee accounts, insider trading, wire transfers, check kiting and the fabrication of Asset Liability Committee (ALCO) minutes. As Tennessee Commerce Bank's CFO, Complainant had signed all 10Q's and 10K's since November 10, 2005. Complainant signed the last 10Q on November 14, 2007. Complainant signed the 10Q at that time because Crowell and Crowell did not identify the suspicious activity until November 30, 2007. Complainant informed Mr. Sapp and Mr. Helf in the January 24, 2008 discussion that he was taking his concerns to Tennessee Commerce Bank's audit committee. Complainant alleged Mr. Helf told him that he better not go to the Audit Committee. In Complainant's presentation to the Audit Committee on February 15, 2008, he noted Mr. Helf told him "it would not be a good idea for you to go the audit committee."

Complainant sent an email to Mr. Helf and Mr. Sapp on January 31, 2008 regarding problems with internal controls and the impact of the weaknesses on the bank. Complainant noted he had raised several related issues on occasions too numerous to count but no corrective action had taken place. The most recent issue Complainant raised was about position descriptions that he had asked to be completed for one and a half years. Complainant stated if the position descriptions

were in place, it would "clearly delineate authority and responsibility for all areas that impact the accuracy of the financial reports that I certify." Complainant specifically identified "suspicious activity" in Mr. Cox's area of responsibility. Complainant asked to meet with Mr. Helf and Mr. Sapp to determine how they intend to resolve the issues. Complainant noted in light of the audit and soon to be submitted 10k about Tennessee Commerce Bank's attempt to raise capital, he suggested they meet before the following Wednesday.

Complainant shared his concerns with Kraft CPAs (Tennessee Commerce Bank's external auditors) on or about February 5, 2008.

Because of the significance of Complainant's concerns about certain improper activities as defined by Tennessee Commerce Bank's Whistleblower policy, Complainant obtained personal counsel (Miller and Martin PLLC, later replaced by Shine and Mason) to assist him in fulfilling his legal obligations under SOX and related studies and banking laws. Complainant's counsel sent a letter to Tennessee Commerce Bank on February 8, 2008 and noted that Complainant was required to provide certain certifications in connection with Tennessee Commerce Bank's upcoming SEC filings. The letter noted that Complainant was not in a position to provide the certifications because of his awareness of improper activities and material weaknesses in internal control structure. Complainant elaborated on his concerns in a presentation to the audit committee on February 15, 2008. Subsequently, Complainant determined that Tennessee Commerce Bank was not fully investigating his concerns and he informed the bank's counsel that he intended to meet with the FDIC and TDFI. Complainant met with the FDIC and TDFI on March 6, 2008 to further raise his concerns.

Complainant specifically raised concerns with Mr. Helf on February 12, 2008 about Mr. Helf's June 2007 insider trading. After a heated discussion, Complainant left Mr. Helf's office and Mr. Helf followed Complainant down the hall trying to talk about Complainant's concerns. Two of Complainant's employees sent emails to Complainant about the incident later that evening. Both emails indicated that Mr. Helf was the aggressor and wanted Complainant to talk about the issues Complainant would be raising to the audit committee on February 15, 2008. Complainant told Mr. Helf that he could not talk about the meeting and that Complainant was following Tennessee Commerce Bank's whistleblower policy. Complainant alleged that he also raised Mr. Helf's insider trading with Tennessee Commerce Bank's counsel, Ms. Mitchell, on March 3, 2008. In addition, the FDIC received a letter from an unnamed "Concerned Depositor" on February 26, 2008. The letter to the FDIC raised concerns about Mr. Helf's June 2007 insider trading as well as the same concerns raised by Complainant about internal controls. The FDIC verbally notified Tennessee Commerce Bank about the letter by at least March 3, 2008 and Tennessee Commerce Bank suspected that Complainant wrote the letter. Complainant and his personal counsel met with the FDIC on March 6,

-6-

2008 and discussed his concerns. Kraft CPAs' audit confirmed two material weaknesses in internal controls in their April 17, 2008 report.

Tennessee Commerce Bank was aware of Complainant's protected activity because the concerns were raised directly to Tennessee Commerce Bank's executive officers, audit committee, counsel and the FDIC.

Complainant was subjected to adverse actions on March 7, 2008, when he was placed on administrative leave and thereby suffered damage to his personal and professional reputations, and on May 5, 2008, when he was terminated from his employment with Tennessee Commerce Bank.

When Complainant was placed on administrative leave, he was instructed to have no contact with any Tennessee Commerce Bank employee without going through Mr. Helf, Mr. Sapp or Mr. Cox, as the acting CFO. In addition, Complainant was instructed not to go to the office without permission. The supposed purpose of the administrative leave was to allow Complainant to focus his full attention on the investigation of the internal control allegations he raised. However, Complainant could not access Tennessee Commerce Bank's computer system or information necessary for him to assist the independent auditor's (Horne LLP) investigation of his concerns.

The temporal proximity of the adverse actions to Complainant's protected activity, culminating in his meeting with the FDIC on March 6, 2008, creates a strong inference of retaliation. Moreover, Tennessee Commerce Bank's explanations of its actions are not supported by the evidence. With respect to placing Complainant on leave, Tennessee Commerce Bank asserts that the board of directors made that decision in a special board meeting on March 7, 2008. However, Tennessee Commerce Bank began the process of issuing an 8K, in which it stated that the Complainant has been placed on administrative leave before March 7th. Moreover, it submitted the 8K to be "*EDGAR-ized*", five hours before the board meeting and submitted a press release 20 minutes after the board meeting began (at 1:50 p.m.), even though the board meeting did not end until 2:45 p.m. Further, with respect to Complainant's termination, although the bank states that the board of directors made the decision to terminate Complainant on April 22, 2008, the evidence shows that the decision was actually made earlier. For instance, Mr. Cox sent an email to the internal auditor on March 27, 2008 stating Tennessee Commerce Bank wanted "*to take our time to search for the right CFO this time!!*" Additionally, one of Complainant's employees stated that he had been seeking employment elsewhere because of Complainant's actions and had been offered another job. However, the employee rejected the offer when he learned that Complainant was not returning to work with Tennessee Commerce Bank. The employee rejected the alternative offer of employment on March 16, 2008, long

-7-

before the date on which Tennessee Commerce Bank purports that the board of directors decided to terminate Complainant's employment. Thus, credible evidence shows that the decisions about Complainant's administrative leave and termination were not made in the manner or timing that Tennessee Commerce Bank asserts.

There is also evidence of animus and intent to retaliate against Complainant in emails from Mr. Cox to Crowell and Crowell on February 25, 2008 and February 29, 2008, before Complainant's administrative leave on March 7, 2008. Mr. Cox stated in one email that he was "*in a 'get even' mode and I am enjoying every minute of it.*"

(Docket Entry No. 1, Complaint, Exhibit 1, at 2-6) (emphasis in the original).

The "Secretary's findings" also reflect that the Defendants participated in this process and were given the opportunity to present evidence and argument prior to the "Secretary's findings." The Defendants' participation is reflected in the following section of the "Secretary's Findings."

Tennessee Commerce Bank asserted it would have taken the same adverse actions regardless of any protected activity, but the evidence does not support this claim. Tennessee Commerce Bank asserts both external auditors stated Complainant grossly neglected his duties as SOX compliance officer and that Complainant displayed poor management and communications skills. However, both auditors deny telling Tennessee Commerce Bank that Complainant was grossly negligent. Also, Tennessee Commerce Bank did not take any action against Complainant because of his supposed performance, behavior, or conduct until after he raised protected concerns.

Tennessee Commerce Bank also asserted that Complainant showed little interest in the SOX program and failed to begin required SOX testing until it was too late. Based on Complainant's expertise and knowledge as an experienced certified public accountant and chief financial officer, Tennessee Commerce Bank asserts Complainant could not have reasonably believed that the complained of conduct, violated securities laws. However, the evidence does not support Tennessee Commerce Bank's assertions. 2007 was the first year Tennessee Commerce Bank was required to be SOX compliant and Complainant had raised policy concerns several times before December 2007. Crowell and Crowell and Kraft CPAs conducted SOX testing throughout 2007 and it was Crowell and Crowell's testing that first identified suspicious activity and possible violations that Complainant later took to executive officers, Kraft CPAs and the audit committee. Kraft CPAs' findings dated April 17, 2008, concluded there were two material

-8-

weaknesses in the areas of concern raised by Complainant, thereby confirming Complainant's concerns.

On August 24, 2009, OSHA sent its initial findings to the Tennessee Commerce Bank advising that it had reasonable cause to believe that Complainant's protected activity was a contributing factor in the adverse actions taken by Tennessee Commerce Bank. Tennessee Commerce Bank was offered an opportunity to meet with OSHA and provide additional evidence. On September 23, 2009, the OSHA investigator, the Nashville Area Director and a Solicitor's representative met with Tennessee Commerce Bank's attorneys. No new evidence was proffered in this meeting. After the meeting, the parties requested and were granted additional time to try to mediate a resolution of the case. The parties were given until November 30, 2009 to complete mediation. However, the parties could not reach agreement on a resolution, On December 8, 2009, Tennessee Commerce Bank submitted additional arguments and documentation to OSHA, including a letter from the SEC dated December 3, 2009 stating the SEC would not recommend any enforcement actions against Tennessee Commerce Bank as a result of Complainant's concerns. Tennessee Commerce Bank also requested to meet with OSHA again to discuss how the SEC's findings affect Complainant's allegations that he participated in protected activity. OSHA decided no further meetings were necessary.

The new information submitted by Tennessee Commerce Bank has not persuaded OSHA to alter its findings that there is reasonable cause to believe Tennessee Commerce Bank violated SOX.

Id. at 6-7.

Upon consideration of the entire record, the Secretary found that "[a] preponderance of the evidence indicates that the Complainant's protected activity was a contributing factor in the adverse action taken against him. Accordingly, OSHA finds that there is reasonable cause to believe that Tennessee Commerce Bank violated SOX." Id. at 7.

As a result, the Secretary preliminarily ordered Fort's immediate reinstatement at his former rate of pay, $335,000, as well as back pay, with all rights of seniority, benefits, bonuses and interest on back wages and bonuses, as well as stock options that Fort would have enjoyed, but for his termination. Id. The Secretary also awarded Fort his attorney's fees as of the date of

-9-

that proceeding.  Id.  The Secretary also ordered expungement of any references to Fort's exercise

of his rights under SOX and enjoined any retaliation or discrimination against Fox for initiating

and filing his complaint.  Id.

## B. CONCLUSIONS OF LAW

The parties agree that the threshold issues present two questions of law: (1) whether the

district court has jurisdiction to enforce the Secretary's preliminary order for violations of the

whistleblower provisions of the Sarbanes-Oxley Act of 2002, and, if so, (2) whether the

Secretary's procedure for her findings and ordering reinstatement comply with due process

requirements.  For the reasons stated below, the Court concludes that jurisdiction exists to

enforce the Secretary's preliminary orders under AIR 21 for violation of the whistleblower

protections of SOX, and the Secretary's procedures here were sufficient to satisfy due process

requirements.  As such, the Secretary's motion for a temporary restraining order and preliminary

injunction should be granted and Defendants' motion to dismiss should be denied.

The jurisdictional question presents an issue of first impression in the Sixth Circuit, but

was addressed by the Second Circuit in Bechtel v. Competitive Technologies, Inc., 448 F.3d 469

(2d Cir. 2006).[2]  There, the Second Circuit considered a district court's order enforcing the

Secretary's preliminary order of reinstatement of a whistleblower for the Defendant's violation of

SOX.  The district court concluded that jurisdiction existed.  The Second Circuit reversed, but

with a divided panel that failed to reach consensus on any issue.  In essence, two judges declined

to allow the district court to enforce the Secretary's preliminary order, but for different reasons.

_____

[2]To be sure, another district court has held that it lacked jurisdiction to enforce the
Secretary's preliminary orders.

-10-

Judge Jacobs concluded that the statutory scheme of SOX and AIR 21 did not grant district courts jurisdiction to enforce the Secretary's preliminary orders. Id. at 473-74. Judge Leval declined to reach the jurisdictional issue, concluding only that the Secretary's investigation and procedures failed to satisfy due process requirements because of "the Secretary's failure to follow its own regulations, [that] resulted in a process that did not meet the requirement of Brock [v. Roadway Express, Inc., 481 U.S. 252 (1987)]." Id. at 482-83. Finally, Judge Straub who dissented on both issues, essentially concluded that the statutory scheme conferred jurisdiction upon the district court to enforce the Secretary's preliminary orders and also concluded that the Secretary's procedures were adequate under due process precedents, specifically Brock. Id. at 483-90.

As to whether this Court concludes that a district court has jurisdiction to enforce the Secretary's preliminary restatement order, in sum, the Court is persuaded by the opinion of Judge Straub in Bechtel and adopts his analysis for several reasons. First, in interpreting "unclear" federal statutes, the court must consider "the importance of the duty in the statutory scheme, the capacity of courts to enforce it effectively, and the necessity for judicial enforcement if the rights of the aggrieved party is not to prove illusory." Chicago and NWR Company v. United States Trans. Union, 402 U.S. 570, 578 (1971). In addition, "[a] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void or insignificant." Duncan v. Walker, 533 U.S. 167, 174 (2001) (quoting Market Co. v. Hoffman, 101 U.S. 112, 115 (1879)).

This analysis begins with the text of the relevant statutes at issue that are set forth in 49

-11-

U.S.C. § 42121(b)[3] that provides as follows:

(1) Filing and notification.--A person who believes that he or she has been discharged or otherwise discriminated against by any person in violation of subsection (a) may, not later than 90 days after the date on which such violation occurs, file (or have any person file on his or her behalf) a complaint with the Secretary of Labor alleging such discharge or discrimination. Upon receipt of such a complaint, the Secretary of Labor shall notify, in writing, the person named in the complaint and the Administrator of the Federal Aviation Administration of the filing of the complaint, of the allegations contained in the complaint, of the substance of evidence supporting the complaint, and of the opportunities that will be afforded to such person under paragraph (2).

(2) Investigation; preliminary order.--

(A) In general.--Not later than 60 days after the date of receipt of a complaint filed under paragraph (1) and **after affording the person named in the complaint an opportunity to submit to the Secretary of Labor a written response to the complaint and an opportunity to meet with a representative of the Secretary to present statements from witnesses, the Secretary of Labor shall conduct an investigation and determine whether there is reasonable cause to believe that the complaint has merit and notify, in writing, the complainant and the person alleged to have committed a violation of subsection (a) of the Secretary's findings. If the Secretary of Labor concludes that there is a reasonable cause to believe that a violation of subsection (a) has occurred, the Secretary shall accompany the Secretary's findings with a preliminary order providing the relief prescribed by paragraph (3)(B).** Not later than 30 days after the date of notification of findings under this paragraph, either the person alleged to have committed the violation or the complainant may file objections to the findings or preliminary order, or both, and request a hearing on the record. The filing of such objections shall not operate to stay any reinstatement remedy contained in the preliminary order. Such hearings shall be conducted expeditiously. If a hearing is not requested in such 30-day period, the preliminary order shall be deemed a final order that is not subject to judicial review.

\* \* \*

(3) Final order.--

(A) Deadline for issuance; settlement agreements.--**Not later than 120 days after**

---

[3]The SOX provisions, 18 U.S.C. Section 1514A(b)(2)(A), incorporate and refer to the provisions of 49 U.S.C. § 42121(b).

the date of conclusion of a hearing under paragraph (2), the Secretary of Labor shall issue a final order providing the relief prescribed by this paragraph or denying the complaint. At any time before issuance of a final order, a proceeding under this subsection may be terminated on the basis of a settlement agreement entered into by the Secretary of Labor, the complainant, and the person alleged to have committed the violation.

(B) Remedy.--If, in response to a complaint filed under paragraph (1), the Secretary of Labor determines that a violation of subsection (a) has occurred, the Secretary of Labor shall order the person who committed such violation to--

(I) take affirmative action to abate the violation;

(ii) reinstate the complainant to his or her former position together with the compensation (including back pay) and restore the terms, conditions, and privileges associated with his or her employment; and

(iii) provide compensatory damages to the complainant.

If such an order is issued under this paragraph, the Secretary of Labor, at the request of the complainant, shall assess against the person against whom the order is issued a sum equal to the aggregate amount of all costs and expenses (including attorneys' and expert witness fees) reasonably incurred, as determined by the Secretary of Labor, by the complainant for, or in connection with, the bringing the complaint upon which the order was issued.

\* \* \*

(5) Enforcement of order by Secretary of Labor.--Whenever any person has failed to comply with an order issued under paragraph (3), the Secretary of Labor may file a civil action in the United States district court for the district in which the violation was found to occur to enforce such order. In actions brought under this paragraph, the district courts shall have jurisdiction to grant all appropriate relief including, but not limited to, injunctive relief and compensatory damages.

49 U.S.C. § 42121(b)(2)(A), (b)(3) and (b)(5) (emphasis added).[4]

To give a literal reading of only Section 42121(b)(5), its provisions would authorize a

---

[4]These provisions are incorporated by SOX at 18 U.S.C. §1514A(b)(2)(A).

-13-

civil enforcement action for "an order" entered under its provisions of subsection(b)(3). Section 42121(b)(2)(A) makes an express reference to issuing a "preliminary order" under 42121(b)(3)(B). Unlike Section 42121(b)(3)(A)'s reference to a "final order," Section 42121(b)(3)(B) and (b)(5) refer only to "an order." Thus, an ambiguity arises on whether Section 42121(b)(5)'s language authorizing actions to enforce "an order" applies to a preliminary order and a final order of the Secretary. To give effect to both provisions, Section 42121(b)(5) can reasonably be interpreted to permit an action to enforce "an order" under Section 42121(b)(3)(B) that is incorporated into Section 42121(b)(2)(A). The Court notes that Section 42121(b)(5) does not refer to the "final order" that appears under Section 42121(b)(3)(A). As discussed below, there is not any cited legislative history that Congress intended to deny enforcement of the preliminary order under Section 42121(b)(3) that is incorporated into Section 42121(b)(2)(A).

Despite the statute's ambiguity, an examination of all of its provisions demonstrates that Congress intended to provide an enforcement mechanism in Section 42121(b)(5) for both final orders and preliminary orders under Section 42121(b)(2)(A) that expressly incorporates Section 42121(b)(3)(B)(ii). This Court concludes that Congress intended to equate the two orders and provide judicial enforcement of both orders. This interpretation gives effect to both provisions of Section 42121 and serves the purposes for which Congress enacted this specific statute.

To rule otherwise would result in a complete frustration of a Congressional mandate upon the Secretary's finding of cause. Applying United Transport principles, SOX represents an important statutory scheme. Courts can effectively enforce this scheme, that in essence, is enforcement of a parallel administrative preliminary order. In the Court's view, judicial enforcement is necessary if the mandate created by these statutes "is not to prove illusory," 402

-14-

U.S. at 578, or rendered "insignificant." Duncan, 533 U.S. at 174. As to the Sixth Circuit precedents cited by the Defendants, the Court is not adding to the statute nor is the Court interpreting the statute to serve some salutary purpose. Rather, the Court interprets an ambiguous statute authorizing a civil action so as to give effect to a clear Congressional mandate.

Defendants argue that 49 U.S.C. § 42121(b)(5) only refers to enforcement actions by the Secretary in United States district courts for failure to comply with orders issued under 49 U.S.C. § 42121(b)(3), namely final orders. The term "final order" is mentioned only in Section 42121(b)(3)(A). This construction would effectively read Section 42121(b)(3) in isolation and fails to acknowledge the references in Section 42121(b)(2)(A) to Section 42121(b)(3) ("the Secretary shall accompany the Secretary's findings with a preliminary order providing the relief prescribed by paragraph (3)(B)"). Section 42121(b)(5) refers to lack of compliance with "order[s] issued under paragraph (3)." Such a reading is most commensurate with the overall statutory structure and stated goals of the statute.

The Defendants' construction of the statute would effectively eliminate the reinstatement remedy of the preliminary order that Congress deemed necessary to protect a whistleblower employee from a demonstrated violation of SOX.[5] Defendants' construction would effectively nullify the language of 49 U.S.C. § 42121(b)(2)(A) that objections to a preliminary order cannot stay enforcement of the preliminary order. Congress's mandate would be rendered nugatory under the Defendants' argument that courts lack the authority to enforce preliminary orders of reinstatement. As stated in Duncan, "were we to adopt respondent's construction of the statute,

_____

[5]As Judge Straub noted in his opinion, "At oral argument, none of the parties was aware of any alternative mechanisms available to the Secretary to immediately enforce her orders." Bechtel, 448 F.3d at 484.

-15-

we would render the word 'State' insignificant if not wholly superfluous. 'It is our duty to give effect, if possible, to every clause and word of a statute.'" 533 U.S. at 174 (quoting <u>United States v. Menasche</u>, 348 U.S. 528, 538-39 (1955).

Moreover, the legislative history reflects that Congress enacted the SOX in response to massive corporate fraud in the market place and sought to enact strong enforcement tools to prevent a future crisis, including new regulations and reporting requirements, expanded oversight, and new criminal provisions. A key provision of SOX protects a whistleblower from retaliation, because "often, in complex fraud prosecutions, ... insiders are the only firsthand witnesses to the fraud." S.Rep. No. 107-146, at 10 (2002). Congress thus created a procedure whereby wrongfully discharged whistleblower can seek redress, including immediate preliminary reinstatement through the Department and the courts. The importance of this Congressional purpose is underscored by 49 U.S.C. § 42121(b)(2) that provides upon the Secretary's finding of reasonable cause, the issuance of the preliminary reinstatement order is mandatory, has immediate effect and notwithstanding any subsequent objections and requests for an administrative hearing by the employer, "[t]he filing of ... objections **shall not operate to stay any reinstatement remedy** contained in [a] preliminary order.") (emphasis added).

As stated by Judge Lambert, the purpose of the Acts' provisions at issue here is to protect whistleblowers and to avoid discouragement of employees from reporting violations of SOX.

> The language and history of the Act then evince a strong Congressional preference for reinstatement as a means of encouraging whistleblowers Congress's preference, moreover makes eminent sense. The Act's provision for *immediate* orders of preliminary reinstatement encourages whistleblowing by assuring potential whistleblowers that they may remain employed, integrated in the workplace, professionally engaged, and well situated in the job market. Such orders also facilitate whistleblowing by enabling whistleblower to continue on as

-16-

observers and potential witnesses to corruption.

Bechtel, 438 F.3d at 496 (emphasis in the original with footnote omitted).

Judge Straub's extended analysis of the purpose and intent of the whistleblower protections of the SOX is particularly compelling:

> These provisions, taken together, reflect Congress's sense that timely reinstatement is essential to prevent the chilling effects of employer retaliation. Congress's firm language would be rendered entirely ineffective if we interpreted the Act in such a way that courts had no power to enforce administrative orders of reinstatement.
>
> The importance of effective preliminary reinstatement is plain not simply from the statute's mandatory language and strict deadlines but also from the purpose of the statute as a whole. Congress made clear, in enacting the Sarbanes-Oxley Act, that it viewed corporate whistleblower not simply as good guys who deserve reward but also as useful-indeed essential-combatants against corporate malfeasance.
>
> The Senate Judiciary Committee's report on the Act, for example, listed whistleblower protection as one of three main purposes of the Act (alongside criminal liability for wrongdoers and bars to bankruptcy discharge). S.Rep. No. 107-146, at 2 (2002) ("Senate Report"). In the "Background and Need for Legislation" section of the Senate Report, which narrated the epic demise of Enron, the Committee explained that the cover-up efforts of Enron's management included "discourag[ing] at nearly every turn" attempts by "employees at both Enron and [its auditor] Andersen . . . to report or 'blow the whistle' on fraud," The Senate Report concluded that a "culture, supported by law," existed at Enron and related companies:
>
>> that discourage[s] employees from reporting fraudulent behavior not only to the proper authorities, such as the FBI and the SEC, but even internally. This 'corporate code of silence' not only hampers investigations, but also creates a climate where ongoing wrongdoing can occur with virtual impunity. The consequences of this corporate code of silence for investors in publicly traded companies, in particular, and for the stock market, in general, are serious and adverse, and they must be remedied.
>
> Id. at 5. The Committee also recognized the importance of these employees to any attempt to enforce new safeguards: "often, in complex fraud prosecutions, these insiders are the only firsthand witnesses to the fraud. They are the only people

-17-

who can testify as to 'who knew what, and when,' crucial questions not only in the Enron matter but in all complex securities fraud investigations." Id. at 10.

. . . The alternative is likely to discourage initial whistleblowing and, where a whistleblower has been removed pending the administrative and judicial processes, to send a chilling signal to co-workers who notice the whistleblower's sudden (and to all appearances permanent) disappearance. As the Supreme Court explained in considering an analogous whistleblower provision in the Surface Transportation Assistance Act of 1982:

> Congress . . . recognized that the employee's protection against having to choose between operating an unsafe vehicle and losing his job would lack practical effectiveness if the employee could not be reinstated pending complete review. The longer a discharged employee remains unemployed, the more devastating are the consequences to his personal financial condition and prospects for reemployment. Ensuring the eventual recovery of backpay may not alone provide sufficient protection to encourage reports of safety violations.

Bechtel, 448 F.3d at 485-86 (footnotes omitted and citing inter alia, Brock, 481 U.S. at 258-59) (emphasis added).

For the reasons stated above, when Sections 42121(b)(2)(A), (b)(3)(B), and (b)(5) are reviewed collectively, the Court concludes that jurisdiction exists to enforce the Secretary's preliminary reinstatement order at issue. To so conclude serves and fosters a clear Congressional mandate.

As to Defendants' due process contentions, Brock and Bechtel provide guidance on due process issues in the context of an interim reinstatement of a terminated employee. Brock involved interim reinstatement of an employee who was the victim of employer retaliation for reporting a violation of federal regulations for motor carriers. 481 U.S. at 255-56. After an investigation of the reporting employee's complaint, the Department of Labor official issued " a preliminary decision ordering [the employee's] immediate reinstatement with backpay" under

-18-

Section 405 of the Surface Transportation Assistance Act of 1982. Id. at 256. In rejecting the employer's challenge to the immediate reinstatement order, the Supreme Court held: "Providing the employer the relevant supporting evidence and a chance to meet informally with the investigator, to submit statements from witnesses and to argue its position orally satisfies the constitutional requirement of due process for the temporary deprivation under § 405." Id. at 266.

As a general rule for other federal statutes requiring immediate reinstatement of an employee, the Supreme Court concluded:

> minimum due process for the employer in this context requires notice of the employee's allegations, notice of the substance of the relevant supporting evidence, an opportunity to submit a written response, and an opportunity to meet with the investigator and present statements from rebuttal witnesses. The presentation of the employer's witnesses need not be formal, and cross-examination of the employee's witnesses need not be afforded at this stage of the proceedings.

481 U.S. at 264.

In determining how much process is due under these statutes, courts must weigh three "substantial" interests: (1) the government's interest in encouraging whistleblowing, Bechtel, 448 F.3d at 262; (2) the employer's interest in controlling the makeup of its staff, id. at 263; and (3) the employee's interest in his livelihood (which depends not merely on receiving backpay but also on being able to find another job). Id. In Bechtel, Judge Straub cited Brock and observed as to the statute at issue here, "[a]lthough an employer's interests must be protected by a pre-reinstatement investigative procedure that ensures a minimum degree of reliability, after a certain point the value of additional reliability is outweighed by the cost of 'extending inordinately the period in which the employee must suffer unemployment.'" Bechtel, 448 F.3d at 488 (quoting Brock, 481 U.S. at 266). Ultimately, in whistleblower actions, the inquiry focuses

-19-

on whether "the prereinstatement procedures establish a reliable initial check against mistaken decisions, and complete and expeditious review is available." Brock, 481 U.S. at 263 (quotation omitted). The Court agrees with Judge Straub that under Brock, Congress may provide "*practical effectiveness* if the employee could not be reinstated pending complete review. The longer a discharged employee remains *unemployed*, the more devastating are the consequences to his personal financial condition and *prospects for employment*." Bechtel, 448 F.3d at 486 (quoting Brock, 481 U.S. 258-59) (emphasis added in Bechtel).

In Bechtel, Judge Leval found that the Secretary failed to meet Brock's due process requirements. Specifically, because the defendant there "'was not given reasonable notice of the evidence'-as opposed to the allegations-'against it.'" Bechtel, 448 F.3d at 488 (emphasis added). Judge Leval's particular concern was that the summary of the allegations against the defendant there was "not a summary at all, but a mishmash of disconnected sentences that does not provide a coherent or comprehensible picture of the evidence against [the defendant]." Id. at 481.

The "Secretary's Findings" here, quoted supra, are clear and detailed. The Secretary provided ample notice of the specific factual allegations at issue, her investigator's report and shared the Department's initial findings with the Defendants who presented evidence and extensive arguments to the Secretary's representatives. Defendants had ample opportunities to challenge these initial findings. Defendants presented their views prior to the "Secretary's Findings" giving rise to the preliminary order at issue. Those findings, albiet of reasonable cause under the SOX statute, was by a "preponderance of the evidence" that the Defendants had unlawfully retaliated against Fort in violation of the SOX. The Court concludes that the Secretary's process here satisfied due process requirements by affording the Defendants prior

-20-

notice of specific facts and an opportunity to present evidence and argument before issuance of a preliminary order. This process provided "a reliable check against mistaken decisions" as required by Brock.

Defendants' due process contention also cites their permanent loss of corporate funds, given the Secretary's preliminary order and the absence of any stay of that Order pending further administrative proceedings. The Defendants are regulated by the SEC and seek investors in their publically traded stock. In this context, the costs of compliance with the Secretary's preliminary order based upon factual findings is a regulatory cost of doing business. Moreover, Section 42121(b)(2) provides for 'expeditious[ ]' hearings upon the filing of any objections, presumably in large part to minimize the burdens on the employer of preliminary reinstatement before the merits are fully determined." Bechtel, 448 F.3d at 485.

As to the award of either the temporary restraining order or preliminary injunctive relief, the traditional factors to be considered are:

(a)     whether the movant has shown a strong or substantial likelihood or probability of success on the merits;

(b)     whether the movant has shown irreparable injury;

(c)     whether the preliminary injunction could harm third parties; and

(d)     whether the public interest would be served by issuing the preliminary injunction.

Dayton Area Visually Imparied Persons, Inc. v. Fisher, 70 F.3d 1474, 1840 (6th Cir. 1995). None of these factors is a " prerequisite[] that must be met" in every action. Id. at 1480 (quoting In re DeLorean Motor Co., 755 F.2d 1223, 1229 (6th Cir. 1985)).

-21-

Where the government seeks a statutory injunction, a lesser showing of the public interest, irreparable injury or the balance of hardship may be made. United States v. First Nat'l City Bank, 379 U.S. 378, 383 (1965) ("Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interest are involved.") See also United States v. Edward Rose & Sons, 384 F.3d 258, 264 (6th Cir. 2004) and CSX Transp., Inc. v. Tenn. State Bd. of Equalization, 964 F.2d 548, 551 (6th Cir. 1992) (tradition elements do not apply "since Congress has expressly authorized the granting of injunctive relief to halt or prevent a violation of" the Act);

Here, for the standard for the issuance of a preliminary injunction, the Court concludes that the Secretary has made a showing of a likelihood of success given her extensive factual findings. Fort would suffer irreparable injury for the reasons set forth in the Acts' legislative history quoted above. Given the Defendants' status as a publically traded company seeking private investors, weighing the balance of harm, i.e. the Defendants' payment of interim relief, favors enforcement of the Secretary's preliminary order, given the importance of the statutory purposes here. The public interest is served by enforcement of this Congressional mandate.

For these collective reasons, the Court concludes that the Secretary's motion for a temporary restraining order and preliminary injunction should be granted and the Defendants' motion to dismiss should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the 19th day of May, 2010.

William J. Haynes, Jr.
United States District Judge

-22-